Good morning. May it please the Court, Douglas F. Cushney appearing for the appellant, Kouichi Taniguchi. There are basically five points set forth in the appeal in this manner. I'd like to address them under the time permitted, reserving, say, about three minutes at the end of argument for any rebuttal. The first and major problem is that the trial court made various fact determinations, believing one aspect of the testimony and not believing another aspect of the evidence admitted. This is particularly with respect to the declaration, this being a summary judgment proceeding, which was submitted by Mr. Watanabe, the manager of Defendant Kan Pacific. Mr. Watanabe testified by declaration that the collapsed deck area was perfectly fine, no rot, no problems at all. Unfortunately, with his testimony, this is directly contradicted by the maintenance records of Kan Pacific, which essentially show that, in fact, nothing had ever been checked. No maintenance had ever been done on this particular area ever at any time since its purported construction two years previous. Consequently, within that presentation by Kan Pacific itself, there's an inherent conflict. We submit that the jury should have had an opportunity to examine the testimony of Mr. Watanabe as well as the maintenance records of Kan Pacific. Other than the apparent absence of inspection, which could or could not be a neutral one, was there any proof in the record that management knew the deck was defective? There is nothing which says that they knew it was defective. The problem there being, of course, which is the next issue of this appeal, they destroyed the evidence which would establish that it was defective, either defective by lack of maintenance, defective by lack of design, defective by lack of construction capabilities and proper construction. All of that was wiped out by virtue of the fact that nearly immediately after the accident, the following day, it was all destroyed. They repaired the deck and destroyed the old decking. That's correct. That resulted from the repair. Is there any evidence in the record that the management of the facility was aware your client had a claim when they destroyed the salvaged material? There was no claim filed at that time. The management saw, as is testified by Mr. Watanabe, Mr. Taniguchi fall through the deck some four feet down. It seems to me that reasonable people running a resort should be acutely aware of the fact that when one of their guests, potential guests, crashes down through a deck area, for no apparent reason, just looking at a very attractive view out at the ocean, that there's liable to be a claim made. But he said he was okay, didn't need any medical attention. Why would that put the resort on notice that there would be a claim if he didn't require any medical attention, he affirmatively said that he was fine? I think that, Your Honor, may be an overstatement as to what exactly happened. Watanabe's declaration says that when Taniguchi left, he said, okay. But he wasn't okay. He'd just fallen four feet through a deck. And it's reasonable to suppose that the man was hurt. The man was hurt because when you fall four feet through a deck, particularly if you're as big and powerful as this guy was, you're going to get hurt. And you could very well be in shock. And it's not fair to say to somebody when they've just had an accident, oh, are you okay? Of course you're going to ask if somebody's okay. Sure. If somebody falls, that's the first thing you do is ask, are you okay? And the response is more than likely to be, yeah, yeah, I'm okay. This guy's an athlete. He's an athlete. He's a powerful guy, certainly bigger than I am. And his reaction is going to be when he has something like that happen, yes, I'm okay. But it wasn't okay. Are you faulting the resort for taking him at his word? Yes. Yes, I am. I am, Connor. Because it is a public access area catering to resort-type people. That is, tourists coming in to have a good time, to relax, and so forth. And what happens is he is designated, he is told to go to a particular area and look at the beautiful view. He goes to the particular area and looks at the beautiful view. And the earth gives way, so to speak, underneath him. And for them to destroy evidence when they have insurers, when they have lawyers, prior to the time that anybody else. That's because you're a lawyer. We're all lawyers. Somebody stubs their toe, we think of a lawsuit. But if you're like a normal person, somebody has an accident, they say, I'm going to fix my deck. They don't think, I better save my wood for spoilation problems. I mean, it seems to me that in the ordinary course, they did what you would normally do. I mean, if they're repairing their deck, they wouldn't normally save the former deck. And do you have any evidence, is there any evidence in the record that suggests that they were on notice or that there was some other reason that they would have saved that? The other reason that they would have saved that is because they are in a position of catering to the public. They're not normal people. They're running a business which gets money from people who come there to stay and presumably be safe as business attendees. We're not talking about what Your Honor describes as just a guy on the street fixing something up. We're talking about the structural collapse of part of a building. We're not talking about the slip and fall in a grocery store or stumbling over a piece of packing which should be cleaned up. We're talking about the structural failure of a building. And under those circumstances, Your Honor, I submit it would be far more normal since these people are running a large business, they have insurers, they would put the material aside if for no other reason than to figure out for themselves what happened. Why did this collapse? You have about three minutes left. Did you want to say that? I would simply like to note that the res ipsa matter has been pled under paragraphs 10 and to a certain extent 11 of the complaint and we would certainly rely upon that too. Thank you, Your Honor. Thank you. Good morning. Vic Pierce from Camp Pacific, Saipan Limited. I think the court is based on the questions. I think the questions that I certainly would have asked myself in this case. There is no additional evidence of any negligence on the part of Camp Pacific. There's no evidence whatsoever. The argument rests on res ipsa locator which is this court. Ninth Circuit has held you look to the law of CMI for the res ipsa and it's not a burden shift and it's not a presumption, it's an inference. And it requires that all responsible causes including the conduct of the plaintiff and third parties are sufficiently eliminated by the evidence. And the plaintiff in this case made no effort to eliminate any of the calls. For instance, strict liability on the part of the manufacturer of the wood. In fact, there's nothing in the record to indicate that he even inquired as to where we obtained the wood or who built the deck that fell. Decks don't just collapse and people fall through them. Isn't that fact combined with a lack of inspection enough? Your Honor, there is no lack of inspection. The only thing in the record about inspection is from the declaration by Watanabe who said he inspected about once a week and painted it every six months. I think what you were asking, I think, was you, sir, about the inspection records and Mr. Cushnie, learning counsel, said there was only one document. There is nothing in the record to show that you have before you, or and I checked this morning and if I'm wrong I apologize, there's nothing in the record to show what documents they requested. Whether they requested documents about the repair, whether they requested maintenance records for six months or two years, or and there's certainly nothing in the record to show that was presented to the district court that yes, I took the deposition of the document, custodian of Camp Pacific, Saipan Limited, and inquired as to whether records had been routinely destroyed, whether they kept maintenance records. There's nothing in there, so that's what Judge Munson was doing. He was saying the plaintiff did not do their job. How old was the deck? Two years, I think, Your Honor. Approximately two years. And so to me, it's just as likely, and this was not eliminated by the plaintiff, a defective wood, which we're not strictly liable as an innkeeper. We're liable for negligence. The seller of the wood would be strictly liable, and the manufacturer of the wood who cut the board would be strictly liable, but not us. Was there any discovery on that? No, Your Honor. The plaintiff did not do any discovery on that. Was the issue of racist ipsalopiter even litigated during summary judgment? Not that it wasn't in the papers. There's no testimony, excuse me, there's no transcript of the oral argument. It was raised at oral argument. At summary judgment? I believe so, Your Honor. And in exactly what context, we don't know because there's no transcript. But it was raised, and I think it's not this thing about pleading. I'm not sure where that comes from. If you look at the restatement, it's under 328D, the restatement of tort second. All it is is inference that can be raised in certain points. And so there's nothing magical about it. In this case, it doesn't have any application to help the plaintiff, just like it doesn't help the plaintiff under restatement tort 343, which is the innkeeper's liability. Because the only evidence in district court is that my client was not negligent, and they did not eliminate other sources. As for the faulty, excuse me, us believing Mr. Taniguchi, he wasn't hurt? Of course. He says he wasn't hurt, we believed him. And I think Mr. Watanabe, if you read his declaration closely also, it's important that these were Japanese. Japanese, he said in his declaration, don't sue each other like Americans do. They're Japanese people, Mr. Taniguchi's Japanese, Mr. Watanabe's Japanese. And there were no visible signs of injury, no bleeding, no nothing? I don't know that the record says that, Your Honor. I do know that he, I mean, we admit he fell through. There's no question about that. But he did say he wasn't hurt. And so, of course, it's the resort. If you look at the notes in the spa area, they had to repair the deck immediately, of course. And so the plaintiff, excuse me, the defendant could not be faulted for cleaning up their mess made by the broken deck. And so there's certainly no indication that Mr. Cushnie or Mr. Watanabe, excuse me, Mr. Taniguchi said, I'm going to sue you or ask you to ask them to preserve the decking so that proper investigation could be taken at a later time. It's not in there. If the court didn't have any particular questions, I'll just sit down. All right. Thank you. That's always good. Mr. Cushnie. Thank you. With respect to the conflict in evidence, I'm afraid Conpacific is in error this morning with respect to what the record contains. The record, Appellant's Excerpts of Records, ER 28, contains the request for production of materials. The request is, please produce all documents evidencing maintenance and repair of the deck area which collapsed as alleged in this action from the date the deck was constructed. Response, all documents will be produced. Next, please produce all documents evidencing a maintenance or repair schedule for said deck area. Response, all documents will be produced. Next, starting on ER 31, there is a statement, injury report from Conpacific. I don't know who signed it, but it was produced. ER 32 provides the materials that had to go into the deck repair, as does ER 33 and 34. There is nothing else produced showing the maintenance on the area. Consequently, the evidence before the court at that time showed absolutely no maintenance, no construction efforts, no nothing ever since the deck had been constructed. With respect to the REH CPSA, the brief, of course, sets forth the requirements of REH CPSA, and one of the first requirements is, of course, would this kind of event have happened without some sort of negligence by the person or persons who have control of the area within which the event occurred. And if decks just don't collapse. I thought in ER 36, 37, there was an affidavit from the assistant manager who said the deck was two years old, had been painted every six months, and inspected once a week. That's correct, Your Honor. I don't know about the inspection once a week, but the two years, yes, and the painting every six months, that's correct. There is no record on ER 35, which is directly contradicted by their own maintenance records. There's nothing in their maintenance records which shows any such thing happened. You can't. I thought you said there were no maintenance records. The one maintenance record is on ER 32, which shows what happened at a particular day, November 7, 2006. Other than that, there's nothing. At ER 32, I have the injury report when Mr. Taniguchi came back to Saipan. At ER 32, there's a Camp Pacific mark on it of quadruple zero four, and that shows a job report for the date the deck was, I guess, started repair. Otherwise, there's no other maintenance records whatsoever that were produced. There are none. Consequently, that's in direct conflict with what the manager stated. Well, he didn't say that we kept the maintenance records. He said we maintained it. He didn't say that we kept the records. That's correct, Your Honor. He said he inspected it once a week. He didn't say I have a record of inspection. He said they painted it. There's no record of any painting being ever done on this area. There's no record of anything at all ever being done on that deck. Consequently, it's up to a jury, I submit, to determine is Mr. Watanabe telling the truth, or is there some reason why the details which are clear in this particular document at ER 32, which shows the date that the deck was repaired and shows other types of jobs, they fixed the light. It was that detailed, and yet over the preceding two years, nothing. Nothing on a deck that collapsed. Your time has expired now. Thank you. The case of Taniguchi v. Saipan is submitted.
judges: Hawkins, McKeown, Rawlinson